[Civ. No. 45865. Second Dist., Div. Five. July 25, 1975.]

SANDRA LEE CARTT, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
STANDARD OIL COMPANY OF CALIFORNIA,
Real Party in Interest.

COUNSEL

Hecht & Diamond and Roger Jon Diamond for Petitioner.

Robert E. Cartwright, Edward I. Pollock, William H. Lally, Stephen I. Zetterberg, Robert G. Beloud, Ned Good, David B. Baum, Arne Werchick, Elmer Low, Leonard Sacks and Raymond T. Bonner as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Pillsbury, Madison & Sutro, Noble K. Gregory, C. Douglas Floyd, Lawler, Felix & Hall, Reed A. Stout, Thomas E. Workman, Jr., J. Richard Morrissey and Bernard E. LeSage for Real Party in Interest.

OPINION

KAUS, P. J.—This writ proceeding arises out of a typical consumer class action in which the damages sought by each of the class members are paltry—a few dollars at most—yet if there is any merit to the suit, the total recovery may run into six or seven figures. This, therefore, is precisely the type of action which results in "substantial benefits . . . both to the litigants and to the court" (*Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d) because "separate actions would be economically unfeasible" (*id.,* at p. 715), which action, if meritorious, "produces several salutary by-products" (*Vasquez* v. *Superior Court,* 4 Cal.3d 800, 808 [94 Cal.Rptr. 796, 484 P.2d 964]), and, in connection with which trial courts are urged to be "procedurally innovative" (*City of San Jose* v. *Superior Court,* 12 Cal.3d 447, 453 [115 Cal.Rptr. 797, 525 P.2d 701]) and to be guided by "realistic considerations, unique to the class action setting" (*Southern California Edison Co.* v. *Superior Court,* 7 Cal.3d 832, 842 [103 Cal.Rptr. 709, 500 P.2d 621]).

After extensive hearings the respondent court certified this case as a class action. However, it then ordered the named plaintiff to expend nearly $70,000 on individually mailed notices to about 700,000 persons on a mailing list which does not identify any class members, which contains many nonmembers and which does not include many others who are members.

The parties before us are the petitioner Sandra Lee Cartt, the class action plaintiff, and real party in interest, Standard Oil Company of California ("Standard"), the only defendant below.[1]

## FACTS

In April 1970, plaintiff Cartt, purporting to represent herself and all Standard credit card purchasers, filed her class action. She alleged, in substance, that starting in January 1970 Standard extensively advertised the value of "Chevron F-310" gasoline in various media. The advertisements represented that Chevron F-310 would produce a significant reduction of exhaust emissions and of resulting air pollution. These representations allegedly were false in that, in fact, Chevron F-310 either did not affect emissions, or was positively harmful to automobiles and the environment. Relying on Standard's advertising, plaintiff and the members of her class purchased at least 300,000,000 gallons of F-310 gasoline at an estimated increase of five cents per gallon over the prevailing market price of gasoline in Southern California. Plaintiff sought $15,000,000 in actual damages, and $15,000,000 in punitive damages to "be awarded to the American Cancer Society or other organizations concerned with health, or to the plaintiffs, as the court deems proper."[2]

Defendant answered the complaint in August 1970. The years rolled by. Plaintiff's delay in bringing the matter to trial was apparently caused, at least in part, by the pendency of a proceeding before the Federal Trade Commission involving a complaint against Standard, filed December 29, 1970, charging deceptive advertising in connection with F-310 gasoline. The administrative proceedings did not terminate until

---

[1] The matter reached us in this way: in February 1975 plaintiff filed a petition for "Supersedeas, Mandate and Prohibition" in the California Supreme Court, which transferred the matter to us. To prevent the five-year statute (Code Civ. Proc., § 583, subd. (b)) from running, we stayed proceedings in the respondent court on March 13. This stay order was later modified to permit proceedings other than the actual trial to take place. On April 2, 1975, we granted an alternative writ of mandate.

In addition to the submissions and arguments of plaintiff and the real party in interest, we have had the benefit of briefs and arguments from several amici curiae, to whom we express our thanks.

[2] Defendant, in its opposition filed with us, estimates that "each member's actual damage would probably range between 50 cents and five dollars, . . . ." It uses the trifling amount of each member's recovery as an argument in favor of dismissing the class action—a suggestion hardly in harmony with the philosophy of *Vasquez, supra.*

November, 1974, when the FTC issued a detailed cease and desist order against Standard, which order is being appealed.[3]

While, at this point, we are not concerned with the legal effect, if any, of the FTC order on the liability issues which may eventually be litigated in the respondent court, the order does indicate that plaintiff Cartt's action, whatever its other shortcomings may be, is not made out of whole cloth.

On January 17, 1975, the respondent court certified the case as a class action. The class was defined to consist of persons who were residents of Santa Barbara, Ventura, Los Angeles, San Bernardino, Orange, San Diego, Riverside and Imperial Counties—"Southern California"—"at any time within the period commencing January 1970 and ending on April 20, 1970, who were then named holders of credit cards issued by defendant and who during said period read or heard the advertising of defendant concerning Chevron F-310 gasoline . . . and in reliance on said advertising purchased through said credit card any quantity of said gasoline."[4]

On February 18, 1975, after three hearings on the question of notice, the court ordered plaintiff to notify,[5] by first or third class mail, each of the 700,000 current Standard credit card holders presently residing in Southern California. No list of credit card holders during the relevant months of 1970 was available because the "quarterly master registers for the year 1970 were not retained by Standard after the end of the year 1973." Although the parties have spent much labor in blaming each other for this state of affairs,[6] the damage caused by the disposal of the

---

[3]The conclusion of the lengthy opinion on which the FTC order is based is "that the F-310 advertisements . . . were false, misleading and deceptive in violation of section 5 of the Federal Trade Commission Act. . . ."

[4]In its order certifying the case as a class action the respondent court resolved several issues in favor of plaintiff. Specifically, it ruled that: (1) the class was ascertainable, even though at that stage individual members were not yet identifiable (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 706); (2) there were questions of law and fact common to the class members; (3) the class action was superior to other available alternatives; (4) plaintiff Cartt was a member of the class and was "an adequate representative for the class"; and (5) notice to the class had to be given before the trial of the issue of liability.

[5]The notice required class members to "opt out" or be bound by any judgment. (Civ. Code, § 1781, subd. (e) (2).)

[6]Although at an early point during the oral proceedings below the trial court expressed its feeling that plaintiff was "woefully late" in attempting to resolve the notice problem, the court never expressed any reason to reconsider its finding that she was adequately representing the class. Plaintiff's counsel, on his part, expresses astonishment that

1970 list is really almost minimal. Even if it were available, it still would not be a list of class members, but only of candidates for membership: To be a class member, the card holder must have purchased F-310 gasoline during the relevant period; but just to try to determine whether any particular card holder did so, it is necessary to search in Standard's microfilm records of 1970 purchases, which according to an experiment run by Standard, takes about one hour per card holder.[7]

The list of 700,000 current card holders is therefore both too short and too long. It is too short because it does not contain class members who no longer hold Standard cards, or members who have left Southern California. It is too long because it contains many thousands who are not members.[8]

The cost of mailing, as ordered by the court, is about $68,718—quite out of the reach of plaintiff, who is a school teacher and earns less than $15,000 a year.

Plaintiff's own suggestion concerning an adequate notice is that she be required to give notice as provided by section 6064 of the Government Code, a procedure authorized by the not directly applicable Consumer Legal Remedies Act (Civ. Code, § 1781, subd. (d))[9] or, alternatively that plaintiff print the notices at her own expense and that defendant be ordered to include them in its monthly statements to its credit card customers, a process referred to as "stuffing."

---

Standard, fully aware of this action, would nevertheless destroy its register of 1970 credit card holders. Clearly, neither side is wholly blameless.

[7]Standard performed such an experiment in order to arrive at an estimate of what it would cost to find card holders who may have purchased F-310 gasoline in its "Western Operations" region, which comprises several Western states. The total figure was $9,426,558.

[8]The record contains no estimate concerning the percentage of dilution of members in the current list. That it contains perhaps as much as 50 percent of nonmembers may be gathered from the following facts, all furnished by Standard:

A. In any one month only about half the card holders make credit card purchases of any kind—not necessarily even gasoline.

B. In December 1969 there were 1,029,825 card holders in "Southern California"—not defined county by county. The reduction of this figure to 700,000 suggests a lot of movement—commercial as well as geographical.

[9]Plaintiff estimates the cost of such publication to be $1,580 and states that she can afford it. This proposal is, however, based on the assumption that publicity is not one of the goals of publication. Thus, although plaintiff proposes to spend $240 in San Diego County for publication in the San Diego Daily Transcript, $220 in Imperial County (Holtzville Tribune) and $200 in Orange County (Orange Coast Daily Pilot), she would get off cheapest in Los Angeles County, where the Daily Journal would only charge $140.

DISCUSSION

1. *Eisen IV*

On its face the notice ordered by the trial court appears to reach a perverse result: despite the California Supreme Court's positive and encouraging attitude toward consumer class actions, the order effectively kills this litigation by decreeing that plaintiff must expend huge sums she does not have to effect a mailing guaranteed not to reach a substantial part of the class she represents, which will, however, be received by thousands who have no interest in plaintiff's suit. If we are to adhere to the legislative and judicial policies by which we are bound, such a result should be avoided, if we can do so without doing violence to applicable constitutional principles and the integrity of the class action process.

The respondent court clearly felt that its hands were tied by *"Eisen IV"* (*Eisen* v. *Carlisle & Jacquelin* (1974) 417 U.S. 156 [40 L.Ed.2d 732, 94 S.Ct. 2140]). Since the parties and amici discuss *Eisen IV* at length, the case provides a useful point of departure.

*Eisen* involved a class action on behalf of about 6,000,000 individuals and entities, of which the names and addresses of 2,250,000 were "easily ascertainable, . . ." (*Id.,* at p. 175). After proceedings dating back to 1966 and appellate decisions known as *Eisen I* (*Eisen* v. *Carlisle & Jacquelin,* 370 F.2d 119), and *Eisen II* (*Eisen* v. *Carlisle & Jacquelin,* 391 F.2d 555) the district court eventually ruled that rule 23(c)(2) of the Federal Rules of Civil Procedure ("Rule 23") would be satisfied if plaintiff were to give individual notice to but a fraction of the 2,200,000 identifiable class members, provided he supplemented the notice by publication in certain widely read papers. The defense was ordered to bear 90 percent of the cost of such notice, or about $19,500. After a reversal of this order in *Eisen III* (*Eisen* v. *Carlisle & Jacquelin,* 479 F.2d 1005), the Supreme Court granted certiorari and, in effect, reversed the district court. The court held that the requirement of Rule 23 that class members be given the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," meant precisely what it said: 2.25 million individual notices, regardless of cost or circumstances of the particular case. ("There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs." [417 U.S., at p. 176].) The Supreme Court further held that Rule 23 does not permit dispensing with notice before trial (*id.,* at pp. 176-177), or conducting a

preliminary or "mini" hearing on the probable or apparent merits of the suit for the purpose of determining whether to shift all or part of the cost of giving notice from the plaintiff to the defendant. (*Id.,* at pp. 177-178.)

The respondent court made the order under review after stating that the part of *Eisen IV* which deals with notice was "a due process case" and that the facts of this case were the same "in that the identities of the individuals are known. . . ."

### 2. *Eisen IV Is Factually Inapplicable*

We shall presently discuss the rather limited legal impact of *Eisen IV* on a California consumer class action. At this point we point out why the respondent court was mistaken in believing that the facts of *Eisen IV* are comparable.

If there is one aspect of *Eisen IV* on which there can be no dispute, it is that the Supreme Court interpreted Rule 23 in light of a finding that the 2,250,000 class members were "easily ascertainable" as such. Therefore, there were 2,250,000 members that could be reached with 2,250,000 letters.[10]

Here—for all the reasons previously noted—all we know is that among the 700,000 addresses there will be a substantial number of class members. As for the rest—perhaps as many as half—the mailing is an idle act. Yet even with respect to any member whom the mailing does reach, it would take an hour of someone's time—and Standard has not volunteered to furnish the labor for nothing—to identify him as such. Neither due process nor the integrity of the class action process demands such useless and wasteful procedures.

### 3. *Eisen IV Is Legally Irrelevant at This Point*

The question whether *Eisen IV* held that, in that case, due process, rather than Rule 23, required individual mailing of 2,250,000 notices has triggered a good deal of scholarly writing (see, *e.g.,* McCall, *Due Process And Consumer Protection: Concepts And Realities In Procedure And Substance—Class Action Issues,* 25 Hastings L.J. 1351, 1389-1396; Jacobi & Cherkasky, *The Effects of* Eisen IV *and Proposed Amendments of*

---

[10]Since it was common ground that Eisen would not notify the identifiable 2,250,000 members, the Supreme Court did not discuss what sort of notice to the other 3,750,000 would satisfy Rule 23.

*Federal Rule 23,* 12 San Diego L.Rev. 1, 10-17). We need not take sides in this dispute, beyond noting that if the United States Supreme Court had desired to hold that such notice was constitutionally required, it certainly could have phrased its holding in less Delphic language.[11]

However, we can readily accept, for the sake of argument, that *Eisen IV* defines, as a matter of constitutional law, the type of notice that is required to insure that the result of the class action is binding on all members. It simply does not follow, however, that a state may not permit a class action to go forward unless the defendant can be assured in advance that in the event of a defense victory all members of the class will be foreclosed from further proceedings.[12] A defendant who in one way or another victimizes hundreds of thousands, has, after all, no constitutional right to be subjected to only one lawsuit. This is not to say that the integrity of class action process does not demand that it settle the dispute between the class and the defendant for all practical, as distinguished from theoretical, purposes: that the entire class' complaint is adjudicated *de facto,* if not *de jure.* The class action plaintiff cannot be permitted to use the processes of the superior court to pursue a justice court action masquerading as a consumer class suit. Just how this goal of practical res judicata shall be furthered is, however, not a matter of federal constitutional concern as such: rather, it is the business of the state which furnishes the forum for the class action.[13]

---

[11]On its face *Eisen IV* purports to be nothing but an interpretation of the meaning of Rule 23. While the court does refer to *Mullane* v. *Central Hanover Tr. Co.,* 339 U.S. 306 [94 L.Ed. 865, 70 S.Ct. 652]—undoubtedly a due process case—as having been relied on by the Advisory Committee which drafted Rule 23 (see 39 F.R.D. 69, 106-107) it never said that *Mullane* compelled personal notice to easily identifiable class members in all class actions, whether they involve hundreds of dollars per member or a few cents. To Eisen's argument that the cost of individual notices was prohibitively high and that individual notice was unnecessary because of the small stake of each class member, the court did not reply that due process demands individual notice but, significantly, only referred to the "unambiguous requirement of Rule 23." (417 U.S., at p. 176.)

[12]Even the draftsmen of Rule 23, in spite of their "preoccupation with res judicata" (3B, Moore's Federal Practice, Supp., § 23.45, p. 109) recognized that "the court conducting the [class] action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action." (39 F.R.D. 69, 106.)

Judge Frankel, in a widely quoted article on Rule 23 (43 F.R.D. 39), observed that whatever may have been the intent of the framers of Rule 23 "omniscience" with respect to the res judicata effect of the class action notice is neither "expected or necessary," because absent "parties have a clear right in some later litigation to attack the judgment which purports to bind them." (*Id.,* at p. 46.)

[13]In arguing to the contrary, Standard espouses constitutional doctrine rejected 85 years ago in *York* v. *Texas,* 137 U.S. 15 [34 L.Ed. 604, 11 S.Ct. 9]. That case involved the validity of a Texas statute which did not permit a defendant to make a special appearance to contest the jurisdiction over his person. His only remedy was to permit a judgment to be entered against him and to attack its validity in later proceedings on the

To put this another way: of course, the United States Supreme Court is the ultimate authority in deciding what type of notice would preclude a class member from relitigating issues decided in the class action. The rights of such a member are, however, not before the class action court, nor can they be vicariously asserted by the class action defendant, who in the class action can assert no rights but its own.[14]

The best that the class action court can do is to give itself reasonable assurance that under all of the circumstances that may prevail in the future—the improbability that anyone else who is only minimally damaged will undertake and underwrite new litigation, the statute of limitations, the doctrine of res judicata and, above all, the impact of *stare decisis*—renewed harassment is nothing but a remote theoretical possibility.[15]

---

judgment. Although the Supreme Court characterized the statute as "peculiar" it upheld its validity. "The State has full power over remedies and procedures in its own courts, and can make any order it pleases in respect thereto, provided that substance of right is secured without unreasonable burden to parties and litigants." (*Id.,* at p. 20.)

[14]This is not to suggest that a defendant has no right to a meaningful determination that the court in which he must defend has jurisdiction over the cause. The question whether a plaintiff with a two dollar claim is properly in the superior court cannot be left in limbo forever. Normally, however, even if the only basis for superior court jurisdiction is the class action nature of the suit, the question whether the plaintiff is in the proper court would be determined when the action is certified as a class action, a step which precedes the determination of the proper notice. (See, *e.g.,* Civ. Code, § 1781, subds. (b) and (d).)

[15]"An absent class member could, of course, decide to institute a subsequent suit against the successful class action defendant. This possibility, however, would be exceedingly remote—indeed, far more remote than the possibility that Eisen or any other member of his class would have maintained an individual action in the first instance. For in addition to the financial disincentives to such a suit, the difficulty in convincing a court that he should not be estopped by the prior judgment, and statute of limitations problems, the plaintiff in the subsequent action would confront the most formidable obstacle of all—the stare decisis effect of the prior decision. Only an extraordinarily wealthy, quixotic, and masochistic plaintiff would undertake such a fruitless endeavor. [Fns. omitted.]" Schuck & Cohen, *The Consumer Class Action: An Endangered Species,* 12 San Diego L.Rev. 39, 70.

The authors' reference to the statute of limitations requires some elaboration. In *American Pipe & Construction Co.* v. *Utah* (1974) 414 U.S. 538 [38 L.Ed.2d 713, 94 S.Ct. 756], the Supreme Court held that the filing of a class action tolled the statute as to class members where the class action was later dismissed and (a) the dismissal was on the ground that the class was not sufficiently numerous, (b) the members in question had moved to intervene in the class action, and (c) these parties would have been class members had the suit proceeded as a class action. If conditions (a) and (b), or either of them, prove to be essential to the result, the statute is not tolled as to members of a huge class of consumers, or members of a smaller class who do not seek to intervene. In any event, California is not bound by the decision. We would find it very surprising if, after this litigation is finally concluded, a class member could file his own case and successfully assert that while he is not bound by the notice in this action, the pendency of the action nevertheless tolled the statute as to him.

The basic error in the order under review is that in fashioning it the respondent court focused solely on what, as a practical matter, may be the least important of the factors which will discourage future litigation: the res judicata effect of the pending action on particular class members surfacing after this case is history.[16]

### 4. *The True Purpose of Notice in a Class Action*

■ The principal purpose of notice to the class is the protection of the integrity of the class action process, one of the functions of which is to prevent burdening the courts with multiple claims where one will do. (See *La Sala* v. *American Sav. & Loan Assn., supra,* 5 Cal.3d 864, 873.)

■ However, the notice ordered must be consistent with the broad California concept of consumer class actions,[17] the purposes of which were stated in *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, 808: "Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial."

---

[16]We note the obvious: Rule 23, as such, does not bind California courts. While our Supreme Court has repeatedly referred to Rule 23 as a useful tool (*e.g., Southern California Edison Co.* v. *Superior Court, supra,* 7 Cal.3d 832, 839 ["constructional aids"]; *La Sala* v. *American Sav. & Loan Assn.,* 5 Cal.3d 864, 871-873 [97 Cal.Rptr. 849, 489 P.2d 1113]; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, 821 ["court may find useful"]; *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 709 ["of interest"] it has never adopted it as a procedural strait jacket. To the contrary, trial courts had been urged to exercise pragmatism and flexibility in dealing with class actions. (*Southern California Edison Co.* v. *Superior Court, supra,* at p. 843; *Vasquez* v. *Superior Court, supra,* at p. 820.)

[17]The apparent federal distaste for consumer class actions is not reflected in California. (Compare *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, with: *Snyder* v. *Harris* (1969) 394 U.S. 332, 336 [22 L.Ed.2d 319, 323-324, 89 S.Ct. 1053] [class members cannot aggregate claims to meet jurisdictional requirements]; *Zahn* v. *International Paper Co.* (1973) 414 U.S. 291, 299 [38 L.Ed.2d 511, 94 S.Ct. 505] [class members could not piggyback on named plaintiff whose claim did meet jurisdictional requirement]; *Eisen IV.* See, generally, Schuck & Cohen, *supra,* 12 San Diego L.Rev. 39; McCall, *supra,* 25 Hastings L.J. 1351.)

Even more recently, in *Southern California Edison Co.* v. *Superior Court, supra,* 7 Cal.3d 832, our Supreme Court resolved, in favor of plaintiffs and members of the class, the issue whether the defendant could compel the taking of depositions of unnamed class members by simply serving notice on the named plaintiffs' attorney. (*Id.,* at p. 836.) In concluding that the procedure was impermissible, the court stated: "We fear that the notice procedure employed by [defendant] Edison is susceptible of great abuse. . . . [A] defendant can effectively stifle a class action at the discovery stage, either by imposing impossibly expensive burdens on the named plaintiffs or by chipping away at the size of the class through exclusion of unnamed plaintiffs. It is especially vital to prevent such 'chilling' of class actions in light of their new importance as a litigation tool, presaged by recent federal cases[18] and our own decisions in *Daar* v. *Yellow Cab, supra,* 67 Cal.2d 695 and *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800." (*Id.,* at p. 842; see also, *Carlson* v. *Superior Court,* 33 Cal.App.3d 640, 648-649 [109 Cal.Rptr. 240].)

More specifically, our cases have indicated that class actions should be permitted to proceed, where the economic realities involved in giving "adequate" notice, compared to the small individual losses of class members, would effectively negate any class action. Thus, in *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, which involved an unknown number of Los Angeles taxi-cab users, the court, in distinguishing between an "ascertainable class and the necessity of identifying the individual members of such class" noted that a "finding of a community of interest at this time *may provoke later questions as to the res judicata effect of any judgment herein.* However, as Witkin says, '[A] distinction is sometimes drawn between the maintenance of the suit and its binding effect on the absent parties. A sufficient pleading of the conditions may withstand a demurrer and satisfy the court that the action should proceed. *But if the judgment is thereafter collaterally attacked by an absent party, a more careful scrutiny of its representative character may be made in determining whether it is res judicata.*' " (*Id.,* at p. 706 [fn. and citation omitted; italics added].)

*Daar* was not concerned with notice; the issue was the propriety of a class action. However, in allowing the action to go forward, *Daar* necessarily recognized that there was no economically feasible method of assuring that all class members would receive notice of the action. *Daar* would, doubtless, not have been maintained as an individual action;

---

[18]*Edison* was decided in 1972, before *Zahn* and *Eisen IV* (*ante,* fn. 17).

even the named plaintiff alleged only $100 spent in script book coupons and cash (*id.,* at pp. 702, 703) and the claim was only for overcharges!

In contrast, in *Chance* v. *Superior Court,* 58 Cal.2d 275 [23 Cal.Rptr. 761, 373 P.2d 849], the court, in holding that a class action in foreclosure was proper, where the notes varied in amount from $500 to $1,400 (*id.,* at p. 279) and where potential members of the class opposed a class action (*id.,* at p. 289), was very much concerned with the adequacy of notice.

"[A]ll of the members of the instant class are ascertainable[19] (compare with *Weaver . . . .*) and it is assumed that they will be given notice of the pending class foreclosure action by registered mail or other like reliable method [citation], thereby being afforded an opportunity to decide whether to appear and argue for any and all appropriate or available forms of redress . . . The essentials of due process of law in class suits would appear to be afforded by fair representation in the assertion of claims of class members against the opposing parties in any lawsuit, and notice of the pending suit. [Citations.]" (58 Cal.2d, at p. 290.)

The distinction with respect to the concern for the res judicata effect of the action in *Chance* and in *Daar* is notable. In *Chance,* the class members numbered at most about 2,100 persons; the cab customers in *Daar* probably numbered in the thousands. Thus, personal notice was economically feasible in *Chance.* Also, in *Chance,* the amounts involved were substantial and the class action was opposed by some potential class members. Unlike in *Daar,* the class members in *Chance* were much less likely to abandon their claims, and, absent personal notice to assure that the matter would be res judicata as to the remaining class members, any advantages in the class action mechanism would be negatived by the likelihood that the issue would surface again.

The tension between legally adequate notice and the maintenance of a class action was also impliedly recognized in *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, in which the court appeared to assume that personal notice to class members would be given (see 4 Cal.3d at pp. 820-821). However, although the theme of *Vasquez* was the need for a forum to redress wrongs the righting of which was not economically feasible on an individual basis. the class consisted of only about 200 persons (*id.,* at p. 811) and the amounts—about $1,000 each (*id.,* at p. 815, fn. 11)—al-

---

[19]The court did not distinguish, as it later did in *Daar,* between an "ascertainable" and an "identifiable" class.

though too small to justify individual litigation, were large enough to make individual notice economically feasible. Also, the amounts arguably created a potential for multiplicity—if only in sequential group actions—absent assurances that the notice would be adequate to permit a judgment to be res judicata.

Finally, in *City of San Jose* v. *Superior Court, supra,* 12 Cal.3d 447; in which the court found that a nuisance and inverse condemnation action was not a proper class action (*id.* at p. 460), the court noted "the constitutional importance of notifying absent class members. . . ." (*Id.,* at p. 454.) In *San Jose* too, the facts indicated economic feasibility of notice coupled with the desirability that any judgment be res judicata: the three named plaintiffs sought damages of $500,000 (*id.,* at p. 453, fn. 2) and the class was estimated at 733 (*id.,* at p. 468 [dissenting opinion].)

This case is obviously way over on the *Daar* side of the spectrum. Therefore it is entirely appropriate—as the Supreme Court suggests—to distinguish "between the maintenance of the suit and its binding effect on the absent parties." (67 Cal.2d at p. 706.) The class is huge, the damages per member trifling and the financial burden of the notice ordered by the respondent court entirely out of proportion to its beneficial results when these are compared to the purely theoretical risks of a less expensive method of notifying the class.

The trouble with the notice under review is not that the court abused its discretion. It is, rather, that by overestimating the impact of *Eisen IV* in the context of state class actions and by erroneously equating the facts of that case with those involved here, it came to the conclusion that it had no discretion.

### 5. *Trial Court Considerations*

Before very briefly outlining some of the considerations which may become relevant when the respondent court reconsiders the notice which is to be given in this case, we think it wise to mention that nothing in this opinion must be construed to compel it to make an order which plaintiff can afford. The credit balance in plaintiff's checking account is not a ceiling on what it takes to preserve the integrity of this litigation as a class action.[20]

---

[20]It is quite evident from the record that Ms. Cartt, at least at this point, is not the only person actively interested in the prosecution of this action. The showing made on her behalf at the various hearings which preceded the order under review established that

Now to specifics: first and foremost, consideration should be given to a meaningful notice by publication as authorized by Civil Code, section 1781, subdivision (d). We stress the word "meaningful" to preclude plaintiff from advocating again that minimum compliance by publication in legal journals will suffice. (See fn. 9. *ante.*) The notice given should have a reasonable chance of reaching a substantial percentage of the class members who do not while away their spare time by browsing among fictitious name statements and notices of trustees sales.

We shall say little about the court ordering defendant to "stuff" notices in its monthly billings. Stuffing in this case suffers from all the defects inherent in the notice that was ordered on February 18, 1975, in that the notices could not reach a substantial portion of the class.

This, of course, would not prevent Standard from stuffing at its own expense if it desires to do so. If Standard is sincerely troubled about the res judicata effect of this litigation, it should be permitted to buy as much protection against future claimants as it thinks it needs.[21]

As far as shifting all or part of the cost burden of giving notice to the defendant is concerned, probably the less we say about this problem, at this time, the better.

Although the Legislature, by providing in Civil Code, section 1781, subdivision (d), that a class action defendant can be made to pay for the cost of notice obviously thought otherwise, the concept of making a

she has at her disposal the services and perhaps even the financial resources of others interested in the success of the litigation.

[21]Although federal interpretations of Rule 23 in conflict with *Eisen IV* have no validity within the federal system, nevertheless some decisions may be of value in California. See, *e.g., Berland* v. *Mack* (S.D.N.Y. 1969), 48 F.R.D. 121, 132: ". . . [W]e believe that no rigid rule as to allocation of expense of notice is advisable and that the better course is to decide the issue in each case on the basis of the relevant factors, including the apparent merit or lack of merit in the claim, the defendant's desire to take advantage of the broader *res judicata* effect of a class action, the number of named plaintiffs and their financial responsibility, the value and percentage of their holdings as compared with those of the entire class, the ability of the plaintiffs to make the initial outlay required, and, of course, the cost of notice. Where the claim appears to be a meritorious one and defendants desire it be prosecuted through a class action, it does not seem unreasonable to require the corporate defendant to share the cost of notice, particularly in a case where plaintiffs may be able to reimburse the corporation if the claim is dismissed. On the other hand, where the claim's merit is doubtful, the cost of notice is high, the defendants have no particular desire to gain the advantages of class *res judicata,* and plaintiffs would be unable in the event of dismissal to reimburse the corporation, plaintiffs should be required to pay out the initial expense rather than obtain a 'free ride' at the corporation's expense."

defendant pay thousands of dollars so that a suit against it may proceed, raises obvious constitutional problems which should not be decided until they must be. Clearly, however, an order directing such a defendant to pay[22] has a better chance of surviving a due process challenge if based on an adversary determination of the probable outcome of the suit. Precedent for constitutionally mandated mini-hearings is abundant. (*E.g., Fuentes* v. *Shevin* (1972) 407 U.S. 67, 82-83 [32 L.Ed.2d 556, 570-572, 92 S.Ct. 1983] (replevin); *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 342 [23 L.Ed.2d 349, 354, 89 S.Ct. 1820] (wage garnishment); *Blair* v. *Pitchess,* 5 Cal.3d 258, 277 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206] (replevin or claim and delivery); *Randone* v. *Appellate Department,* 5 Cal.3d 536, 547 [96 Cal.Rptr. 709, 488 P.2d 13] (personal property attachment); *McCallop* v. *Carberry,* 1 Cal.3d 903, 907 [83 Cal.Rptr. 666, 464 P.2d 122] (wage garnishment); *Mihans* v. *Municipal Court,* 7 Cal.App.3d 479, 488 [87 Cal.Rptr. 17] (writ of possession of real property).)

In *Eisen IV* the district court had forced the defendant to pay 90 percent of the cost after a mini-hearing.[23] While we are not so much concerned about the Supreme Court's rejection of the concept which was squarely based on Rule 23 (*Eisen IV, supra,* pp. 177-178) we are very much bothered by the thought of extensive evidentiary presentations on collateral issues occupying our already over-extended trial courts. Therefore we merely point out that where, as here, plaintiff may be able to make out a case of probable liability from public records, such as the FTC proceedings, the idea of a mini-hearing should not be rejected out of hand.

### THE WARRANTY COUNT

In an amended complaint, filed in September 1973, plaintiff added a new class action count for breach of warranty. On November 12, 1973, a

---

[22]Strictly speaking, the defendant is only asked to advance the costs. Realistically the chance of recovering any part of the advance in the event of a victory is as nonexistent as the danger of renewed litigation by insufficiently noticed class members.

[23]The *Eisen* district court (see 52 F.R.D. 253, 270-271) analogized the imposition of notice costs on the defendant to the granting of a preliminary injunction. However, a valid preliminary injunction requires the posting of a bond (*e.g., Elliott* v. *Osborne,* 1 Cal. 396, 397) which protects the defendant against loss. The bond requirement can be and has been waived where the defendant is a governmental entity. (*E.g., Conover* v. *Hall,* 11 Cal.3d 842, 850-852 [114 Cal.Rptr. 642, 523 P.2d 682]; *Powelton Civic Home Own. Ass'n* v. *Department of H. & U. Dev.* (E.D. Pa. 1968), 284 F.Supp. 809, 839-840.) However, absent jurisdictional concerns, we are aware of no case in which a preliminary injunction bond has been waived as against a nonpublic defendant.

demurrer to that cause of action was sustained without leave to amend. Plaintiff now asks us to review the propriety of that ruling, claiming that it constituted an abuse of discretion.

We think the matter—raised almost as an afterthought—is insufficiently briefed by both parties to enable us to make an intelligent ruling. Defendant claims that the trial court was clearly correct because plaintiff did not plead notice of breach of warranty. It ignores, however, what appears to be at least an attempt to plead such notice in paragraph 27 of the warranty count where plaintiff alleges that at "numerous times plaintiff has advised defendants, and each of them, of the facts alleged hereinabove." If lack of pleading of notice was the only basis for the order, plaintiff should at least have been given leave to amend.

There may, however, be other reasons for the court's action. We decline to speculate and grant any relief with respect to the order of November 12, 1973, beyond stating that nothing in this opinion should be interpreted as precluding plaintiff from moving to be permitted to make another attempt to plead breach of warranty.

## CONCLUSION

The order to show cause is discharged and the peremptory writ is granted. Let a peremptory writ issue directing the trial court to vacate its existing orders and to make new orders consistent with the views expressed in this opinion.

Ashby, J., and Loring, J.,* concurred.

A petition for a rehearing was denied August 12, 1975, and petitioner's application for a hearing by the Supreme Court was denied October 23, 1975.

---

*Assigned by the Chairman of the Judicial Council.