[Civ. No. 11310. Third Dist. July 18, 1967.]

KAREN ORSER, a Minor, etc., et al., Plaintiffs and Appellants, v. RICHARD GEORGE et al., Defendants and Respondents.

[Civ. No. 11420. Third Dist. July 18, 1967.]

KAREN ORSER, a Minor, etc., et al., Plaintiffs and Appellants, v. HARRY JAMES, JR., et al., Defendants and Respondents.

(Consolidated Appeals.)

Ralph D. Drayton, Harold Wilsey, Jr., and John L. Feeney for Plaintiffs and Appellants.

A. John Merlo, Edward W. Bergtholdt, Fitzwilliam, Memering, Stumbos & DeMers, William S. Stewart,, R. E. Burness, Rich, Fuidge, Dawson, Marsh & Morris, Dennis C. Noonan and Neil J. Cooney for Defendants and Respondents.

PIERCE, P. J.—Plaintiffs are the heirs of Byron W. Orser. Decedent was shot accidentally by one of two of the named defendants: Vierra or Jacobson. Plaintiffs filed this wrongful death action against all defendants. They appeal from summary judgments in favor of four of the above named defendants: George, Hughes, James and Young. They also appeal from a summary judgment in favor of Jacobson, a fifth defendant. ■■ ■■ ■■ ■ As regards this judgment, the court denied said defendant's motion for summary judgment on one of the counts of the complaint and granted it as to two others.[1]

The complex (but interrelated) questions which we discuss on this appeal, some applicable to some of the defendants, none applicable to all, relate to the following theories of tort liability: (1) the applicability of the rule of *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], which, loosely stated, is that if a person is injured (or killed) because of the negligence of one of two or more persons acting in unison, the actual tortfeasor being unknown, the burden is upon each of the actors to absolve himself of responsibility; (2) the closely-related question of the applicability of the so-called "concert of action" doctrine under which where several people act in concert illegally in pursuance of a common design and one is directly responsible for a resulting injury all are jointly liable; (3) the question of whether, and under what circumstances, certain members of an unincorporated association can be held responsible for the tortious act of another member; (4) the question of the circumstances, if any, under which a landowner or possessor of lands is responsible for the acts of others permitted to use said lands; and (5) the

---

[1]The granting of such a piecemeal judgment was improper. Generally speaking, as to any specific defendant in a single action there can be but one judgment regardless of the number of counts set forth in the complaint. (*Bank of America* v. *Superior Court*, 20 Cal.2d 697, 701 [128 P.2d 357]; *Kennedy* v. *Bank of America*, 237 Cal.App.2d 637, 641 [47 Cal.Rptr. 154]; *Gombos* v. *Ashe*, 158 Cal.App.2d 517 [322 P.2d 933].) It is not disputed that as to at least one of the counts of the complaint applicable to defendant Jacobson the latter's motion should have been denied. It was error therefore for the court to grant a summary judgment in his favor. This judgment will have to be reversed. That will not affect our discussion of the contentions raised on appeal.

question of the applicability of the so-called "ultra-hazardous activity" doctrine as stated in sections 519 and 520 of the Restatement of Torts (see footnote 7, *infra*). (It is conceded a change of California case law would be needed to make that doctrine applicable under the facts of this case.)

We will not relate in detail the rules governing summary judgments under Code of Civil Procedure section 437c. They have been stated and restated by the appellate courts of this state too frequently to require more than a reference to Mr. Witkin's collection of the cases which set forth these rules. (See 2 Witkin, Cal. Procedure (1954) Proceedings Without Trial, §§ 75, 79, pp. 1711, 1716.) We point out in passing, however, that in this appeal we have an ideal illustration of the purposes for which the summary judgment procedure was designed. The facts material to the determination of the issues stated above as to certain of the defendants are substantially uncontested. Summary disposition will save the courts and litigants time and money. (See *Aguirre* v. *Southern Pac. Co.* (1965) 232 Cal.App.2d 636, headnote 4 [43 Cal.Rptr. 73].) These facts are: Orser was killed at approximately 1:15 to 1:30 p.m., April 28, 1963, while repairing a rice checker on a farm leased by J. W. Sharp from Zumwalt (see *infra*). The cause of death was a bullet fired from a pistol. The bullet was removed during an autopsy, and it and a certain pistol (with others) were examined at the Criminal Investigation and Identification (C. I. & I.) laboratory in Sacramento, where it was determined the bullet had been fired from that pistol. At or about the time of death Vierra and (possibly) Jacobson had each fired that specific pistol under circumstances to be described.

The approximate time of death was fixed as follows: Sharp and his wife had driven along a road close by the farm equipment on which Orser was working. This was approximately at 1 p.m. Orser was then at work welding. Sharp stopped and talked with him for a few minutes then drove on. Perhaps 10 minutes later, one James Stegall drove down the same road with his son. He discovered Orser wounded by a gunshot but still alive, lying on the ground bleeding. Sharp was summoned and when the two men returned Orser was dead. All of the times given above are estimates.

A description of the scene of the shooting will make the somewhat abstruse circumstances attending it more comprehensible. At all times with which we are concerned defendant George R Zumwalt Co., a corporation, was the owner, and

defendant I. G. Zumwalt Co., a copartnership, was lessee (hereinafter "Zumwalt") of all of the real property involved. One of these properties was the Butler Ranch. On it is a building which sometimes had been used as a clubhouse. Use of the building had been by hunters who had acquired duck hunting privileges elsewhere from defendant J. R. Young. Young, in turn, had acquired these duck hunting privileges from Zumwalt.[2] Two of the named defendants, Hughes and James, were members of an unincorporated association so loosely organized it had had but one meeting and had elected no officers. Defendant Jacobson was a prospective member of the club, although he denied actual membership. Vierra had been invited to join; he had not accepted. A check to Zumwalt for rental of the clubhouse had been made out by James for the club but had not been cashed at the time of the shooting accident. The club members believed their lease of the clubhouse, obtained through Young, included an off-season right to repair the building. Hughes, James, Vierra, Jacobson and George, a guest of James, were spending the weekend at the clubhouse. The purpose of the trip was to repair the clubhouse but some had brought weapons and shot at frogs and mudhens in and about a pond which adjoins the clubhouse.

Immediately adjacent to the clubhouse on the Butler ranch is a pond. Several airphotos in evidence show this pond as describing an arc extending from the west eastward to a point next to the clubhouse, thence northeast to its widest point, terminating at a road which runs along the southerly bank of an east-west irrigation canal. Across this canal and along its northerly bank is another dirt road. It was along the latter road Sharp and Stegall were riding. Orser was doing his welding repair work north of and close to this road at a point due north of the northerly terminus of the pond on the Butler Ranch. (That place is south of the Sharp farm and the two are separated by the irrigation canals and the two roads described.) The weekend had commenced on the afternoon of Saturday, April 27. All persons present at the time of Orser's death Sunday afternoon had at one time or another during the weekend engaged either in shooting at tin cans, frogs or mudhens. Rifles or pistols were the weapons used. During the period when Orser must have been shot, Vierra and James,

---

[2]It has been noted the incident being described happened in April 1963, months after the 1962-1963 duck season. Duck shooting is not here involved. The duck hunting grounds and blinds were some miles away from the clubhouse.

and possibly Jacobson,[3] were firing at a mudhen. Only Vierra and (possibly) Jacobson used the fatal pistol. James, who admittedly fired alternately with Vierra, used a rifle (and thus did not hit Orser). The mudhen's course of flight was along the described pond and in a direct line of fire from the point (near the clubhouse) where the three shooters were located to the point where Orser was working.

The facts stated above appear without conflict from the affidavits and depositions before the trial court when the summary judgments were granted.

### SUMMERS v. TICE AND THE CONCERTED ACTION THEORY.

In *Summers* v. *Tice, supra,* 33 Cal.2d 80, plaintiff and the two defendants were hunting quail in open country Both defendants used shotguns firing shells containing seven and one half size shot. One of the defendants flushed a quail. Both defendants shot at it, and one of them—it is not known which —hit plaintiff who was ahead of them. At a court trial judgment was against both defendants. It was also held plaintiff was not guilty of contributory negligence. The Supreme Court, affirming, relied upon *Oliver* v. *Miles,* 144 Miss. 852 [110 So. 666, 50 A.L.R. 357] (where the facts stated were substantially identical to the *Tice* case) and upon Restatement of Torts, section 876, subsections (b) and (c).[4] It found a reason for its holding in Wigmore, Select Cases on the Law of Torts, section 153: " '. . . The real reason for the rule that each joint tortfeasor is responsible for the whole damage is the practical unfairness of denying the injured person redress simply because he cannot prove how much damage each did, when it is certain that between them they did all; let them be the ones to apportion it among themselves.' "

*Summers* cites, among other cases, *Saisa* v. *Lilja* (1st Cir.

---

[3] Jacobson, whose deposition was taken, did not admit firing the pistol at that target. The record as a whole, however, leaves a triable issue of fact on this point. For the purposes of this appeal we must assume as a possibility the fact he did shoot the pistol during the interval of time Orser may have been killed.

[4] Restatement of Torts, section 876, subsections (b) and (c), read as follows: "For harm resulting to a third person from the tortious conduct of another, a person is liable if he

" . . . . . . . . . .

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

1935) 76 F.2d 380. There the death of plaintiff's intestate was directly caused by the immoderate speed of one Keefe racing with defendant on a public highway. There was evidence defendant had abandoned the race before Keefe had struck decedent. Keefe did not know that when he continued the race. The district judge had instructed the jury that under those circumstances defendant would be liable. The circuit court on appeal approved the instruction, affirmed the trial court's judgment. The court referred to the incident as a ''joint tort.'' Our Supreme Court in *Summers* abstained from referring to the liability as ''joint'' or from calling ''the action of defendant as being in concert as the ground of, decision.'' (See p. 84 of 33 Cal.2d.) It preferred the language of the Restatement, section 876, in subsections (b) and (c), which we have quoted, and it likened the case to res ipsa loquitur cases of which *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], is quoted. (See 33 Cal.2d 86.)

Prosser has stated (Prosser, Torts (3d ed.) p. 258 et seq.) that the words ''joint torts'' and even the type of vicarious liability known as ''concerted action'' have meant different things to different courts. He defines actionable concerted action (on p. 259) as follows: ██ ''All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him.'' He rejects the rule that ''mere knowledge by each party of what the other is doing is sufficient 'concert' to make each liable for the acts of the other'' since one man ordinarily owes no duty to take affirmative ''steps to interfere'' with another's activities absent some special relationship. He says (on pp. 259-260): ██ ''It is . . . essential that each particular defendant who is to be charged with responsibility shall be proceeding tortiously, which is to say with intent to commit a tort, or with negligence. One who innocently, and carefully, does an act which furthers the tortious purpose of another is not acting in concert with him.''

*Summers* v. *Tice, supra* (33 Cal.2d 80) differs from some of the other ''concerted action'' cases, for example, *Saisa* v. *Lilja, supra* (76 F.2d 380) in one respect. Under the facts in *Summers* it was not known which of two hunters fired the shot causing the injury. In *Saisa, supra,* it was known that defendant was *not* the one who directly caused the death.

There the defendant's liability was *assuredly* vicarious. The trial court in the case at bench, as evidenced both by the judgments given and by the court's memorandum, rejected the "concerted action" concept except in the *Summers*-type situation. We do not accept that reasoning. We follow (as did the court in *Summers*—although the statement was dictum) the rule of the Restatement of Torts and that stated by Dean Prosser and quoted above.

 Under those rules, in a summary judgment situation, i.e., where the test is the existence of a justiciable issue, not only Vierra and Jacobson, but also James, must be held as defendants. Vierra and Jacobson because, as is conceded, there is a triable issue under facts indistinguishable from *Summers*. But James too must be held as a defendant because, although he did not fire the fatal bullet, there is evidence *(which may or may not be sufficient to prove him liable at the trial)* creating a question for the trier of fact. This evidence indicates he was firing alternately with Vierra at the same mudhen, in the same line of fire and possibly tortiously.[5] In other words (to paraphrase the Restatement quoted in footnote 4), the record permits a possibility James knew Vierra's conduct constituted a breach of duty owed Orser and that James was giving Vierra substantial "assistance or encouragement"; also that this was substantial assistance to Vierra in a tortious result with James' own conduct, "separately considered, constituting a breach of duty to" Orser We emphasize by repetition that these are only *possibilities.* Axio-

---

[5] In his deposition, at page 25 et seq., James made the following statements regarding his conduct after he joined Vierra at the side of the pond: "Q And in which direction was he shooting? A Shooting in this direction. Q You are indicating north, is that correct? A Yes. Q Do you know what he was shooting at? A There was a mudhen in the water or on the water. . . . Q . . . Was the mudhen moving at all during the time he was shooting at it? A Very slowly. Q And in what direction was the mudhen moving? . . . A . . . It moved in a slight easterly direction and then continued north. Q I see. Now, were you shooting at the mudhen at this same particular time when Mr. Vierra was shooting at it also? A Yes. Q And with your rifle, I presume. A Yes. Q And he was shooting the pistol? A Yes . . . Q All right. Did the mudhen ever leave the water or did he just skim—did he get up and flap his wings? A He flapped his wings a little bit. Q He didn't get off the water as you recall. A No. Q How many times to the best of your recollection did Mr. Vierra shoot the pistol while you were there? A Well, I would say three or four times. Q And how many times did you fire? A I fired twice."

Vierra's deposition confirmed these statements by James. In addition (at p. 25 thereof): Q Did Mr. James fire at the mudhen after it left this position number 5 and went up in the northerly position number 6? A Yes." (Vierra's deposition is contradictory and confusing as to whether James or he fired the last shot.)

matic in the granting of a summary judgment is the rule that "the counter-affidavits [or depositions of the opposing party] are sufficient if they *disclose* evidence supporting *a possible . . . cause of action*; they need not, at this stage prove anything. The purpose of the summary judgment procedure is *not to try the issues,* but merely to determine *whether there are issues to be tried.* And, contrary to the rule governing the moving party's affidavit, the counter-affidavit is *liberally construed.*" (2 Witkin, Cal. Procedure (1954) § 78, p. 1715, and cases cited.) Here, we conclude there are issues to be tried as to James, as well as Vierra and Jacobson.

██ Under the rules discussed above none of the other defendants can be held. Nothing in the record gives the slightest indication that their acts were tortious in any way. Within the meaning of the rules stated, there was no substantial assistance or encouragement. No evidence even suggests they knew that Vierra, Jacobson or James were shooting firearms in the direction where their shots could hit anyone on the Sharp place or on the road. It is stated in Restatement of Torts, section 876, comment b (p. 437) : "The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered. . . . Likewise, although a person who encourages another to commit a tortious act, may be responsible for other acts by the other . . . , ordinarily he is not liable for other acts which, although done in connection with the intended tortious act, were not foreseeable by him. . . . In determining liability, the factors are the same as those used in determining the existence of legal causation where there has been negligence. . . ."

We repeat the phrase often quoted from *Palsgraf* v. *Long Island R. Co.* (1928) 248 N Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (at p. 1255) : ". . . 'Proof of negligence in the air, so to speak, will not do.' "

Ordinarily this would be a question for a fact finder's determination. Here the conceded facts are such as to preclude a difference of conclusion by reasonable minds. The other defendants therefore, under the rules thus far discussed, are as a matter of law not liable.

LIABILITY OF DEFENDANTS AS MEMBERS OF A CLUB

Defendants Hughes and James, as we have stated, had loose-

ly bound themselves together as an unincorporated duck club. Jacobson, on this summary judgment appeal, may possibly be regarded as a member. There was no written agreement, constitution or bylaws. There were no officers. The club had held but one meeting. We shall, nevertheless, regard it here as a duck club in existence

The law of California regarding the liability of members of a nonprofit, unincorporated association or club for the torts of fellow members has not become comprehensively settled. At common law clubs of this category were generally unrecognized as such. (See Garfinkle, *Liability of Members and Officers of Nonprofit Unincorporated Associations for Contracts and Torts* (1954) 42 Cal.L.Rev. 812.) Code of Civil Procedure section 388 provides that two or more persons "associated in any business" may be sued by their common name, and states a judgment will find the joint property of the associates and "the individual property of the party or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability." The seeming limitation of this section to enterprises intended for profit was negated in *Jardine* v. *Superior Court* (1931) 213 Cal. 301 [2 P.2d 756, 79 A.L.R. 291]. Although a stock exchange was there involved, the court analogized that type of organization to *any social club*. (P. 313.) The question is still open, however, whether the code section was intended to add any *substantive* liability to club members. We read it as a procedural statute, creating a quicker, cleaner and simpler method of getting club members into court and of enforcing judgments in cases where, under already existing substantive law, the club and its members were liable, and not as intending to create new liabilities. The law review article refers to the unsettled state of the law.[6] Regardless of Code of Civil Procedure section 388, and even were we to ascribe to the Legislature an intent to create some sort of substantive liability, it could not be that which appellants seek to impose here.

█ It has been held that an unincorporated association is bound to use the same care as a natural person; but that mere membership does not make all members liable for unlawful

---

[6]It says (*op. cit.*, p. 825):
"*Tort Liability*
"*Members*. It is impossible to do more than deal in general terms with the liability of members of nonprofit, unincorporated associations for torts arising from 'associational activity.' Third persons may seek to impose liability upon members for the torts of officers, agents or employees on the basis of vicarious liability."

acts of other members without their participation, knowledge or approval. Vicarious liability may exist, however, based upon the same factors we have discussed above—personal participation in an unlawful activity or setting it in motion. (*Feldman* v. *North British & Mercantile Ins. Co.* (4th Cir. 1943) 137 F.2d 266.)

We need not labor further to discuss the extent of the liability of club members. Certainly it cannot extend beyond the principles of agency upon which the liability of each copartner for the acts of his fellow partners is grounded. (Corp. Code, § 15009, subd. (1); *Dillard* v. *McKnight,* 34 Cal.2d 209, 224 [209 P.2d 387, 11 A.L.R.2d 835].)

 The waterway next to the clubhouse was not a duck hunting pond. The act of shooting at mudhens and frogs across this pond was no part of the purposes for which the duck hunting club was formed The defendant shooters were not acting within the course and scope of their activities as club members. There was nothing inherently tortious in shooting at frogs and mudhens. Members who did so did not thereby "encourage" fellow members to fire in the direction of a road or an adjoining farm.

Since, as we have shown, no vicarious liability founded upon the "concerted action" theory exists, the factor of club membership really adds nothing. Plaintiffs have raised an irrelevant issue.

THE "LIABILITY BY REASON OF OCCUPANCY" ISSUE.

Defendants Hughes, James and Young (with the duck club) may all be said to have had land-occupancy rights to the clubhouse and lands surrounding it effective on the date of the shooting. At least that is a possibility under the liberal construction rules on summary judgment proceedings—the same rules discussed above as applicable to James' liability under the "concerted action theory." In the law of torts occupiers of land have special obligations. (Prosser, Torts (3d ed.), p. 358 et seq.) Their obligations extend to the control of the conduct of their invitees. (*Op. cit.,* p. 363.) They must exercise reasonable care to so control the activities of their invitees that the latter will not create an unreasonable risk to others. (Rest. 2d Torts, § 318.)

 The photographs in evidence and other evidence show clearly the roads running past the north end of the pond, the irrigation canal and the fact that a farm adjoins. Evidence also shows that the height of the banks of the canal was such

that the heads of persons across it were visible. It follows as a matter of law that reasonable minds could not differ that to discharge a firearm in the direction the fatal shot here was fired would be an obviously foolhardy act. Therefore, reasonable minds could not differ that Hughes and Young, who were absent when the fatal shooting took place, exercised no lack of reasonable care in failing "to control" Vierra and Jacobson, their possible invitees, i.e., in not having warned them not to shoot in that direction. Summary judgment was proper as to them. The same cannot be said of James' activity. He was shooting at the mudhen alternately *with* Vierra. (See fn. 5.) Therefore since James possibly was one with an interest in this land, and since he possibly did not exercise reasonable care to control the activities of Vierra and Jacobson so those defendants would not create an unreasonable risk to Orser, there may be said to be a triable issue of fact under which James would be liable under the obligation by reason of the land occupancy issue.

LIABILITY THROUGH MAINTENANCE OF
ULTRAHAZARDOUS ACTIVITY.

 The discharge of firearms is not considered an ultrahazardous activity[7] in this state (*Jensen* v. *Minard,* 44 Cal. 2d 325, 328-329 [282 P.2d 7]; *Tucker* v. *Lombardo,* 47 Cal.2d 457, 463 [303 P.2d 1041].) Appellants here concede such to be the case but suggest the law should be changed. We are bound by the rulings of our Supreme Court and must hold that no liability can here be predicated on this theory. (*Auto Equity Sales, Inc.* v. *Superior Court,* 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; 3 Witkin, Cal. Procedure, Appeal, § 220, p. 2435; *Orange County Water Dist.* v. *City of Riverside,* 173 Cal.App.2d 137, 165-166 [343 P.2d 450].) That is not to say a reversal by the California Supreme Court of its policy regarding the status of the ordinary use of firearms as an "ultrahazardous activity" could in any way affect the out-

---

[7]Restatement of Torts states:

Section 519: "Except as stated in sections 521-4 [not herein applicable], one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultrahazardous, although the utmost care is exercised to prevent the harm."

Section 520: "An activity is ultrahazardous if it

"(a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and

"(b) is not a matter of common usage."

come of the case at bench. The "ultrahazardous activity" doctrine affects the degree of proof. The case at bench presents undisputed facts. Under those facts the trial court has held, and except as noted above we have affirmed, there is no triable issue of fact.

The summary judgments granted in favor of defendants James and Jacobson are reversed as justiciable issues remain as to them. (See fn. 1.) The summary judgments granted in favor of defendants Hughes, George and Young, individually, and doing business as Young's Wild Fowl Gun Club, are affirmed. Since these appeals were consolidated and the costs on appeal cannot actually be segregated with mathematical precision, in the interest of justice respondents George, Hughes and Young shall recover their entire costs on appeal from plaintiffs-appellants, who in turn shall recover two-fifths of their costs from respondents Jacobson and James who shall be liable therefor jointly and severally.

Friedman, J., and Regan, J., concurred.