[Nos. D004174, D006162. Fourth Dist., Div. One. Oct. 7, 1988.]

SAMUEL KAYE et al., Plaintiffs and Appellants, v.
MOUNT LA JOLLA HOMEOWNERS ASSOCIATION et al.,
Defendants and Respondents.

1478

COUNSEL

Michael Kaye for Plaintiffs and Appellants.

Christopher Welsh, Marilyn Moriarty, Martha L. McGill and Coppo & Cosgrove for Defendants and Respondents.

OPINION

**WIENER, Acting P. J.**—Plaintiffs Samuel and Aline Kaye appeal a judgment of dismissal based on the five-year rule of Code of Civil Procedure section 583.310 and separately an order denying their motion to certify a defendant class of members of a condominium homeowners association. Consistent with the Legislature's directive that we liberally interpret exceptions to the five-year statute, we reverse the judgment of dismissal on the ground it was "impracticable" within the meaning of section 583.340 for the Kayes to proceed to trial while a writ petition which successfully challenged the trial court's summary adjudication of issues was pending in this court. At the same time, we reject several other arguments raised by the Kayes on issues made appealable by the dismissal judgment.

On the class certification appeal, the Kayes have conceded that joinder of individual members of the defendant Mount La Jolla Homeowners Association is necessary only because of the potential they might recover a judg-

ment including punitive damages which could not be satisfied by resort to the assets of the association itself. Because we believe there is no possibility of such an occurrence, we have concluded the trial court did not err in refusing to certify a defendant class.

FACTUAL AND PROCEDURAL BACKGROUND

*Factual Allegations*

Plaintiffs Samuel and Aline Kaye own a condominium unit in the Mount La Jolla condominium development. Mount La Jolla consists of 234 contiguous condominium units. According to the covenants, conditions and restrictions (CC&Rs) which apply to the development, the individual unit owners have exclusive ownership of a "dwelling space" which is bounded by the "interior surfaces of the perimeter walls, floors, ceilings, windows and doors . . ." of their unit. The CC&Rs specifically provide, "The following are not part of the units: bearing walls, columns, floors, roofs, foundations, central heating and other central services, pipes, ducts, flues, chutes, conduits, wires and other utility installations, wherever located, except their outlets when located within the units." With the exception of each unit's "dwelling space," each homeowner owns an undivided common fractional interest in the Mount La Jolla complex, which means virtually all of the physical substance of the development consists of jointly owned "common areas."

To maintain and repair these common areas, the CC&Rs created the Mount La Jolla Homeowners Association (the Association). The Association is run by a board of governors elected by the homeowners. Individual unit owners have no authority to arrange for or make repairs to the common areas. This function is exclusively reserved to the board of governors.

In 1977 the Kayes first noticed a crack in the concrete slab floor of the garage of their unit. When minor repair measures failed and the crack reappeared, the Kayes reported the problem to the board of governors. The board hired an engineering firm to inspect the Kayes' unit and four other condominiums which had experienced a similar problem. When the engineering report recommended soil testing to discover the exact cause of the subsidence problem, the board rejected the recommendation, dismissed the firm and hired a new engineer.

Over the next four years, the board together with its new engineer adopted tactics of inordinate delay, deception and intransigence with respect to the subsidence problem in an effort to postpone or avoid paying the substantial sums necessary to make adequate repairs. In early 1980, the Kayes

offered to pay the costs of soil testing. Not only did the board refuse the offer, but it expressly forbade the Kayes from contracting for a soil study on their own.

In the meantime, the condition of the Kayes' unit continued to deteriorate. Cracks appeared in the walls and floor slabs. The walls buckled and bowed to the point that doors would no longer open and close. One end of the unit had sunk nearly three inches lower than the other end.

The soils study recommended in the first engineering report was finally performed under board authorization in the summer of 1981. The study revealed the condominium had been constructed on deep earthfill and that soil preparation defects were the likely cause of the subsidence problem. Even so, the Association proved unresponsive and this lawsuit was filed in November 1981 against the Association and 14 individuals who served on the board of governors during the relevant period (the director defendants). As late as March 1982 the Association's Construction Committee rejected its own engineers' recommendations regarding repairs as "an unnecessary and extreme measure of correction." Nonetheless, by the end of 1983, the Association had expended about $88,000 to make repairs to the Kayes' unit and there is evidence those repairs may be inadequate. The Kayes now seek recovery for diminution in the market value of their unit, lost rents and profits, emotional distress, miscellaneous expenses and punitive damages.

*Procedural History*

In their original complaint, the Kayes sought to allege, among others, a cause of action against the Association and its constituent homeowners[1] for failing to provide lateral and subjacent support for their condominium unit. The Association successfully demurred to that cause of action in May 1982.

A trial date on the remaining causes of action was set for November 6, 1986, about two weeks before the five-year anniversary of the filing of the Kayes' complaint. On August 13, 1986, the Association and the 14 defendant directors moved for summary adjudication of issues seeking to eliminate the Kayes' claims for punitive damages. The original hearing date of September 23 was continued twice until October 17, on both occasions apparently at the Kayes' request. At the hearing, defendants' motion was taken under submission. Further argument was heard on October 24 at which time the court granted the defendants' motion, eliminating all punitive damage claims.

---

[1] The Kayes sought to sue the individual homeowners on a vicarious liability theory as a defendant class. (See *post,* pp. 1489-1494.)

On November 6, the Kayes told the trial court they had elected not to go to trial on that date but instead were seeking a stay and extraordinary writ review of the summary adjudication order in this court. In response, the trial judge took the case off calendar. The Kayes filed their writ petition later that same day. No stay issued. On Friday November 21, the last business day before the five-year anniversary, this court in a nine-page opinion issued a peremptory writ of mandate reversing the summary adjudication of issues as to the Association and five of the defendant directors. Mindful of the approaching five-year deadline, our opinion provided that it would be "final immediately, because the trial date must be set by November 24, 1986, to avoid the running of the five-year statute (Code Civ. Proc., § 583.310)."

On November 25, 1986, the Kayes filed a motion in the superior court to specially set the case for trial. In the papers supporting that motion, the Kayes argued that the five-year statute had been tolled on a variety of theories. Defendants responded that the five-year statute had run and no exceptions were applicable. The trial court agreed with defendants and dismissed the action.

## DISCUSSION

*Five-Year Statute*

 Code of Civil Procedure section 583.310[2] establishes the general rule that a civil action must be brought to trial within five years or it will be dismissed. (See also § 583.360.) The rule is subject to several specific statutory exceptions including an exclusion from the five-year period of any time during which "[b]ringing the action to trial, . . . was impossible, impracticable, or futile." (§ 583.340, subd. (c); see generally *Christin* v. *Superior Court* (1937) 9 Cal.2d 526, 533 [71 P.2d 205, 112 A.L.R. 1153].) The Law Revision Commission Comment to this section indicates the exceptions "must be interpreted liberally, consistent with the policy favoring trial on the merits." (16 West's Ann. Code Civ. Proc. (1988 pocket supp.) § 583.340, p. 47.) In determining whether it was "impossible, impracticable, or futile" to bring the action to trial for some portion of the five-year period, the court must consider "all the circumstances in the individual case, including the acts and conduct of the parties and the nature of the proceedings themselves. [Citations.] The critical factor in applying these exceptions to a given factual situation is whether the plaintiff exercised reasonable diligence in prosecuting his or her case. [¶] . . . Neither the courts nor litigants have any legitimate interest in preventing a resolution of the

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

lawsuit on the merits if, through plaintiff's exercise of reasonable diligence, the goals of [the five-year statute] have been met." (*Moran v. Superior Court* (1983) 35 Cal.3d 229, 238 [197 Cal.Rptr. 546, 673 P.2d 216].) The question before us is whether it was "impracticable" within the meaning of section 583.340 for the Kayes to bring their action to trial during the pendency of the writ proceeding challenging the summary elimination of their punitive damage claims.

■ In *Christin v. Superior Court, supra,* 9 Cal.2d 526, the California Supreme Court established the rule that an interlocutory appeal may toll the running of the five-year statute, even if the trial court technically retains jurisdiction to try the matter, if it would be impracticable to proceed to trial pending resolution of the appeal. Earlier in the *Christin* case, the plaintiff had successfully appealed the trial court's granting of a motion for change of venue. More than five years had passed since the filing of the complaint when the Supreme Court was asked to review the propriety of the trial court's denial of defendant's motion to dismiss. Upholding the trial court, the Supreme Court held the five-year period was tolled for the time during which the venue appeal had been pending. ■ "The purpose of the statute is plain: to prevent *avoidable* delay for too long a period. It is not designed arbitrarily to close the proceeding at all events in five years, . . . ." (9 Cal.2d at p. 532; see also *Rose v. Knapp* (1951) 38 Cal.2d 114, 117 [237 P.2d 981].) Responding to the defendant's argument that plaintiff could have proceeded to trial in the new venue location while concurrently prosecuting his appeal, the Supreme Court stated, "Modern cases recognize as a defense not only objective impossibility in the true sense, but also impracticability due to excessive and unreasonable difficulty or expense. [Citations.] [¶] Counsel for plaintiff, in prosecuting his appeal from the void order, and in taking no steps toward a futile trial . . . acted reasonably and with due regard to the interests of his client and the courts." (9 Cal.2d at p. 533.)[3]

Later cases have expanded on the "impracticability" exception in different contexts. In *General Motors Corp. v. Superior Court, supra,* 65 Cal.2d 88, plaintiffs sued the defendant for personal injuries sustained in an automobile accident. One of the plaintiffs died three years later and her heirs filed a wrongful death action against the defendant alleging her death was the result of her earlier injuries. The heirs then successfully sought consolidation of the two lawsuits. Preparation for trial of the consolidated cases continued for two more years until the defendant moved to dismiss

---

[3] In *General Motors Corp. v. Superior Court* (1966) 65 Cal.2d 88, 98 [52 Cal.Rptr. 460, 416 P.2d 492], the Supreme Court extended the *Christin* rule, holding the five-year statute may be tolled during the pendency of an extraordinary writ petition if it would be impracticable to bring the action to trial before the petition was resolved.

the personal injury action because it had not been brought to trial within five years. The Supreme Court rejected defendant's argument, holding it was "impracticable" for the plaintiff to have proceeded to trial on the personal injury action before the wrongful death action was ready to be tried. The court noted that the evidence in the two cases would be substantially similar if not identical and the value to be served by a trial within five years of the personal injury action did not exceed the cost of two duplicative trials: "Th[e] same issue is central to both the personal injury action and the wrongful death action, and to insist that the relevant evidence be duplicated at two separate trials would exacerbate the already substantial burdens of the litigation." (*Id.* at p. 96.)

Similar reasoning was applied in *Brunzell Constr. Co.* v. *Wagner* (1970) 2 Cal.3d 545 [86 Cal.Rptr. 297, 468 P.2d 553], in which the plaintiff sued two severable groups of defendants in a contract dispute. Procedural disputes with one group of defendants including three interlocutory appeals consumed the better part of five years and plaintiff did not seek to proceed to trial separately against the second group of defendants. The Supreme Court reversed the trial court's judgment of dismissal as to the second group of defendants, holding that "the bare fact of severability does not preclude the application of the 'impracticable and futile' exceptions as that doctrine has been consistently interpreted by this court." (*Id.* at p. 548.) "In many situations in which it is impossible or impracticable to proceed against one codefendant it may be impracticable, in terms of the burden both to the parties and to judicial administrations as a whole, to proceed against other defendants in a separate suit. To require a plaintiff to sever causes of action against multiple defendants *whenever* it becomes impossible or impracticable to proceed against one defendant within the five-year period would be to require unproductive duplication of effort, compel the incurrence of excessive expense, and generally undermine all the policies served by modern theories of consolidation in a substantial number of cases." (*Id.* at pp. 553-554.) In determining whether the impracticability exception applied in such circumstances, the Supreme Court directed trial courts to consider "a great variety of factors, including, among others, the expense, complexity, and quantity of the evidentiary duplication that severance would entail, the potential problems that inconsistent judicial determinations would produce, and the degree of hardship or prejudice to the defendants occasioned by the delay." (*Id.* at p. 554, fns. omitted.)

The rationale of *General Motors* and *Brunzell* was applied to further extend the impracticability exception in *Stella* v. *Great Western Sav. & Loan Assn.* (1970) 13 Cal.App.3d 732 [91 Cal.Rptr. 771]. There, the Court of Appeal held plaintiffs were excused from bringing their action to trial within five years while they awaited the resolution of the appeal in a related case

which eventually settled a significant common legal issue. The court concluded, "Plaintiffs' forbearance in awaiting the outcome of the [related] appeal in our opinion well served the interests of judicial economy." (*Id.* at p. 738.)

The principles outlined above support the conclusion that the Kayes acted reasonably in deferring trial of the case until their writ petition on the punitive damage issue had been resolved and it was therefore "impracticable" within the liberal meaning of section 583.340 to bring the matter to trial within the five-year period. While section 598 would appear to allow for bifurcation of a punitive damages issue, which may be the functional equivalent in this case of a severance of consolidated cases in *General Motors* or a severance of parties in *Brunzell,* those cases make clear that a court must consider practical issues beyond the technical ability to conduct a separate trial. The record here suggests a separate trial of the punitive damage issue would require presentation of evidence already introduced in an earlier trial devoted to compensatory damages. This conclusion is supported by the very reason for our issuing the peremptory writ in the first place: our implied but necessary determination that the Kayes' remedy by way of appeal was inadequate. A separate trial on the punitive damage issue would have been unnecessarily duplicative and wasteful.

Turning to the balancing of the other factors identified in *Brunzell,* inconsistent judicial determinations quite clearly is not a problem where a severance of parties is not involved. On the question of prejudice as a result of the delay, defendants here have alleged no prejudice nor can we independently discern any from the record.

Defendants suggest that proceeding to trial was not impracticable because the Kayes could have tried the case and pursued their writ petition simultaneously, relying on this court to resolve the writ issue before the close of the evidence to enable them to present any additional evidence and argue the issue to the jury. Putting aside the practical limitations on counsel's ability to both prepare for trial and pursue a writ petition, this argument ignores the fact that the presence or absence of the punitive damage issue might significantly affect the structure of the Kayes' evidentiary presentation. In any event, the impracticability of proceeding to trial must be evaluated as of the time the Kayes' counsel made his decision to give up his trial date and pursue the writ. We do not think section 583.340 requires counsel to speculate on how quickly the Court of Appeal will decide a writ petition and whether it will issue a stay.[4]

---

[4] In this sense, an attorney who decides not to proceed to trial may act at his peril. If he is correct and his writ petition is ultimately deemed meritorious, his decision to forego trial effectively results in the same situation as if a stay had issued to prevent a trial. On the other

Defendants also argue the time constraints faced by the Kayes were a product of their own making because they had twice arranged to have the hearing on the summary adjudication motion continued. The fact that the Kayes took advantage of legitimate procedures to seek short continuances—one granted by the court and one stipulated to by the defendants—cannot in our view be held against them.

Finally, defendants suggest the Kayes cannot be afforded relief because they took no action on the Monday following the issuance of our writ opinion to request that the superior court specially set the case for trial on that day. The prospects for success of such a request aside (see Civ. Code, § 3532), the Law Revision Commission Comment to section 583.340 states that "the time within which an action must be brought to trial is tolled for the period of the excuse, regardless whether a reasonable time remained at the end of the period of the excuse to bring the action to trial." (16 West's Ann. Code Civ. Proc. (1988 pocket supp.) § 583.340, p. 47.)

In ruling it was required to dismiss the case, the trial court was apparently concerned that this court had not issued a stay pending its resolution of the writ petition.[5] While our handling of the issue in our writ opinion undoubtedly could have been clearer, the question of whether the five-year statute is tolled by some applicable exception is generally a question of law to be resolved after the fact rather than by means of a stay issued by the appellate court before anyone contends the five years has run. At the time the Kayes filed their writ petition, their case had already been taken off calendar. Thus, there was nothing for this court to stay. The trial court should have drawn no inference from our failure to act on the Kayes' stay request.

Accordingly, we conclude the trial court improperly dismissed the case because, by virtue of the tolling provisions of section 583.340, the five-year period had not run when the court ordered the case dismissed. Following issuance of the remittitur in this case, the trial court shall set a new trial date consistent with the provisions of section 583.350.

*Cause of Action for Subjacent and Lateral Support*

The Kayes contend the court prejudicially erred in sustaining defendants' demurrer without leave to amend their third cause of action seeking damages for the deprivation of subjacent and lateral support. The

---

hand, if the writ petition is denied, it may be later determined that it was not impracticable to proceed to trial because the remedy at law was adequate.

[5] The court's minute order granting defendants' motion to dismiss contains the following notation: "matter *not* stayed by DCA."

Kayes frankly admit there is no exact California precedent on the theory of liability which they wish to establish. They also point out they are disclaiming any reliance on Civil Code section 832 which statutorily defines the lateral and subjacent support to which each coterminous owner is entitled. In spite of these seeming obstacles, the Kayes exhort us to create a new rule which would impose liability on a condominium association and its homeowner members for their failure to provide lateral and subjacent support in the condominium common areas. The Kayes' exhortations are grounded on their concerns that lacking additional sources of recovery the individual condominium homeowner will be denied redress because of limitations periods barring recovery against negligent developers and builders and the likelihood of shrinking insurance coverage. In overstating the problem the Kayes ignore the organizational format of condominium ownership and the respective rights and duties established by the CC&Rs.

We interpret the Kayes' argument as requiring a condominium association and its individual members to indemnify any individual homeowner for any reduction in value to an individual unit caused by damage. Essentially they assert a concept of strict liability. Under this theory the association and individual members would not only have the duty to repair as required by the CC&Rs, but the responsibility to reimburse an individual homeowner for the diminution in value of such unit regardless if the repairs had been made or the success of such repairs. For several reasons we are unwilling to accept this broad rule of recovery.

Initially we fail to understand why the Kayes believe they can assert causes of action for damages against the Association on a theory that they were denied the right to engage in self-help to repair the affected portions of the common area near their unit, but nonetheless believe they should be able to impose liability against their coowners who labored under the same restriction. Obviously the Kayes' fellow co-owners have no greater rights than the Kayes. It would be manifestly unfair to permit the Kayes to impose liability on co-owners who were equally powerless to use self-help to repair the common areas. The democratic process of condominium ownership contained in the CC&Rs did not create a unique class consisting solely of the Kayes. And if the economic burden the Kayes wish to impose is somehow tied to the collective failure of the homeowners to vote for more responsible members to be governors of the Association, they seek an economic sanction which has no relationship to the alleged improper conduct, i.e., an incorrect vote, of the individual homeowners.

We also find it difficult to understand why we should accept the Kayes' invitation and involve ourselves in the intellectual maze consisting of the English common law of subjacent and lateral support and the statutory

scheme provided by Civil Code section 1350 et seq. adopted in 1985 in order to create a new rule of liability when the existing causes of action seem to accomplish the same goal. The Kayes seek the same amount of damages in their second cause of action for breach of fiduciary duty, breach of covenant and the constructive taking of a property interest as they do in their third cause of action. In these circumstances there is little reason to create a new rule when the present remedies are adequate. Moreover, the frustration which the Kayes manifest because the homeowner association and its individual members did not act in a reasonable manner is directed solely to the failure of such persons to perform their responsibilities in accordance with the CC&Rs. Thus both conceptually and factually, the third cause of action duplicates other causes of action.

We reject the Kayes' argument for an additional, perhaps more fundamental, reason. In attempting to transfer the economic loss caused by the reduction in value of their condominium to all the condominium homeowners on a pro rata basis, the Kayes overlook the bargain which they made at the time they acquired their unit. That bargain contemplated a harmonious group living arrangement subject to the rights and duties outlined in the CC&Rs. The CC&Rs require the governing body to repair common areas. There is nothing in the CC&Rs about a "forced buy," i.e., requiring individual homeowners to reimburse an individual homeowner for the diminution in value of a unit in addition to the cost of repair. Placing dual costs on individual homeowners, i.e., the cost of repair plus consequential damages is not only contrary to the bargain but creates a potentially open-ended financial burden on condominium ownership.

The drafters of the CC&Rs here anticipated difficulties might arise with reference to the association's duty to repair under certain circumstances. They expressly provided if repairs were not made for three years following damage to a material part of the project that an individual homeowner would be entitled to commence a partition action. They also provided that partition could be commenced if three-fourths or more of the project had been destroyed and condominium owners holding more than 50 percent of the common areas were opposed to repair or restoration of the project. These provisions limit the remedies of an individual homeowner so that the economic responsibilities of the association could be fairly gauged. Although there may be uncertainties associated with projecting the costs of repair, there is a greater likelihood of accuracy in doing so than if future costs included a contingency for consequential damages including a unit's reduction in value. Restricting the individual homeowner to recovery for the cost of repairs also avoids the risk of requiring the Association to pay for unaccrued damages since the homeowner would not have suffered any damages for reduction in the unit's value until that unit was sold. We

therefore reject the Kayes' desire to engraft the common law rule of liability for failure to provide lateral and subjacent support to condominium ownership. The Kayes have adequate redress under the terms of the bargain made and other aggrieved condominium owners have similar rights in addition to the rights now prescribed by statute.[6] (Civ. Code, § 1350 et seq.)

*Amendment of the Punitive Damage Allegations*

The Kayes attempt to challenge the portion of our writ opinion on the punitive damage question, suggesting we resolved the case against them as to 9 of the 14 director defendants based on their failure to allege facts showing "oppression, fraud or malice" sufficient to satisfy the requisites of Civil Code section 3294. They argue our opinion incorrectly failed to grant them leave to amend their pleadings to allege further facts.

Law of the case to one side,[7] the Kayes' writ petition challenged the trial court's summary adjudication of issues under section 437c, subdivision (f). In support of their motion, the defendant directors submitted declarations denying they acted in a manner which would support the award of punitive damages. This obligated the Kayes to respond with a factual presentation sufficient to demonstrate there existed an issue of material fact to be resolved at trial. We determined the Kayes' presentation was sufficient to warrant denial of the motion with respect to the Association and five of the director defendants. While it is true our opinion referred at times to allegations contained in the pleadings, we also repeatedly mentioned that the declarations created factual conflicts which needed to be resolved by a trier of fact. Accordingly, amendment of the pleadings would not be appropriate.

*Defendant Class Certification*

The Kayes' complaint attempts to plead a portion of their case as a class action—not *on behalf of* a group as in the normal class action situation but rather *against* a group, i.e., a *defendant* class action. (See generally *In re Gap Stores Securities Litigation* (N.D.Cal. 1978) 79 F.R.D. 283, 1 Newberg on Class Action (2d ed. 1985) § 4.45 et seq.; Note, *Defendant Class Actions*

---

[6] The foregoing discussion assumes that the damage for which the Kayes seek recovery is repairable. If that is the case, we reject their contention that they may also recover for any diminution in the value of their property. The Kayes suggest, however, that some of the damage for which the Association is responsible has not yet been adequately repaired and ultimately may not be repairable. If that turns out to be the case, we express no opinion on whether the Kayes may recover for the diminution in the market value of their property resulting from the unrepairable defect.

[7] The Kayes appropriately point out that while the law-of-the-case doctrine would normally apply to preclude their raising this issue, our decision to make our opinion final immediately effectively precluded their arguing this issue in a petition for rehearing.

(1978) 91 Harv. L.Rev. 630.) The Kayes seek to include all members of the Mount La Jolla Homeowners Association in a no opt-out defendant class which they assert is vicariously liable for the actions of the board of governors of the Association. They argue a defendant class action is necessary for several reasons. They point to Corporations Code section 24002, which provides that a judgment against an unincorporated association may not be satisfied by resort to the individual assets of a member of the association unless that member is made a party to the action in his individual capacity. They also claim an absolute right to join any and all members of the Association as defendants under section 388, subdivision (b)[8] and assert that a defendant class action is the only practical means of accomplishing such a result.

On January 6, 1986, the trial court denied the Kayes' motion for certification of a defendant class. Because an order denying class certification is generally an appealable order (see *Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]), the Kayes took an immediate appeal. When the Kayes filed their notice of appeal in Case No. D006162 from the judgment of dismissal based on the five-year statute, the class certification appeal was pending in this court. We ordered the two appeals consolidated for hearing and disposition.

The parties spend the better part of their briefs discussing the vicarious liability issue, which they approach from markedly different perspectives. The Association contends if a court can determine as a matter of law that individual Mount La Jolla members cannot be vicariously liable for the actions of the board of governors, a defendant class should not be certified because common classwide issues will not predominate in the lawsuit. (See generally *Richmond, supra,* 29 Cal.3d at p. 470; *Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 139 [191 Cal.Rptr. 849]; see also Civ. Code, § 1781, subd. (b)(2).) They rely on dicta in *Orser* v. *George* (1967) 252 Cal.App.2d 660, 670 [60 Cal.Rptr. 708] to suggest that under California law, members of an unincorporated association will not be liable for torts committed by the association's officers or governing board unless they participated in the tortious conduct, authorized it or in some sense set it in motion. (See also *Steuer* v. *Phelps* (1974) 41 Cal.App.3d 468, 471-472 [116 Cal.Rptr. 61].)[9]

---

[8] Subdivision (b) of section 388 provides as follows: "Any member of . . . [an] unincorporated association may be joined as a party in an action against the unincorporated association. If service of process is made on such member as an individual, whether or not he is also served as a person upon whom service is made on behalf of the unincorporated association, a judgment against him based on his personal liability may be obtained in the action, whether such liability be joint, joint and several, or several."

[9] We observe that even under *Orser,* as interpreted in *Steuer,* members of an association will be vicariously liable if they entrust another member with the means to commit a tortious act. Here, it is arguable that by entrusting the maintenance and repair of common areas to the

The Kayes respond that the question of whether individual owners can be vicariously liable is an issue going to the merits of the lawsuit which cannot be inquired into during the class certification process under the rule of *Eisen* v. *Carlisle & Jacqueline* (1974) 417 U.S. 156, 177-178 [40 L.Ed.2d 732, 748-749, 94 S.Ct. 2140]. (Accord *Home Sav. & Loan Assn.* v. *Superior Court* (1974) 42 Cal.App.3d 1006, 1013 [117 Cal.Rptr. 485].) They argue the vicarious liability question is one which can and must be resolved on a classwide basis and suggest a motion for summary judgment or judgment on the pleadings following class certification and notice is the proper means of adjudicating this issue. The Kayes admit class certification would not be proper if their argument with respect to vicarious liability were a frivolous one. To refute this suggestion, they point to *Davert* v. *Larson* (1985) 163 Cal.App.3d 407, 412 [209 Cal.Rptr. 445] which holds that "tenants in common of real property who delegate the control and management of the property to a separate legal entity should not be immunized from liability to third parties for tortious conduct." Significantly, *Davert* relies on a Texas Supreme Court decision, *Dutcher* v. *Owens* (Tex. 1983) 647 S.W.2d 948 [39 A.L.R.4th 92], which upheld a judgment in a defendant class action brought by condominium tenants (the Owens) against their landlord (Dutcher) and other members of the condominium homeowners association to recover for personal property destroyed by a fire which began in the common areas and spread to the Owens' unit. *Dutcher* held that the individual owners were vicariously liable for their pro rata share of the judgment, rejecting an argument for joint and several liability.[10] California commentators have read *Davert* and dicta in *White* v. *Cox, supra,* 17 Cal.App.3d at pages 830-831, footnote 3 to indicate that members of homeowners associations will be vicariously liable for common area torts, at least to the extent of their pro rata ownership of the condominium development's common areas. (See, e.g., 1 Hanna, Cal. Condominium Handbook 2d (1986) § 15.7, p. 491; 4 Miller & Starr, Current Law of Cal. Real Estate (Supp. 1987) § 24:82, p. 229; 11 Hagman & Maxwell, Cal. Real Estate Law and Practice (1987 rev.) § 385.91[2], p. 385-67.)

Given the unique facts of this case, however, we have concluded we need not resolve the interesting question of whether, as a general rule, members

Mount La Jolla board of governors, the individual condominium owners become exposed to vicarious liability.

[10] We recognize that both *Davert* and *Dutcher* involve suits by third parties seeking to impose vicarious liability on individual members of an association. However, in *White* v. *Cox* (1971) 17 Cal.App.3d 824 [95 Cal.Rptr. 259], the court held that a member of a condominium homeowners association may sue the association for damages arising out of the improper maintenance of common areas in the condominium project. Mount La Jolla does not appear to argue that homeowners association members should be vicariously liable to third parties but not to other members damaged by tortious acts of the association governing board and in any event provides no authority in support of such a distinction.

of homeowners associations can be vicariously liable for torts committed by members of the board of directors of the association. The Kayes concede any liability of the individual homeowners sought to be joined as class members is vicarious and derivative of the Association's liability; that is, potential class members would not be required to pay unless the Association was unable to satisfy a judgment entered against it. The Association further represents—and the Kayes apparently concede—it has applicable insurance coverage in an amount sufficient to satisfy all the Kayes' claims for compensatory damages. But that is not the end of the matter because the Kayes also seek to recover punitive damages against the Association on the theory the Association is vicariously liable for the malicious acts committed by members of the board of directors who were agents acting in a managerial capacity. (See Rest.2d Torts, § 909, subd. (c); *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822 [169 Cal.Rptr. 691, 620 P.2d 141].) Even assuming the Kayes' theory is proper, however, there is no need for certification of a defendant class consisting of nonparticipant individual homeowners unless there is some possibility the Kayes will obtain a judgment for punitive damages against the Association which they will be unable to satisfy by resort to the Association's assets. Because we view this contingency as legally impossible, we conclude the trial court did not err in denying the Kayes' motion for certification of a defendant class.

In the case of compensatory damages, there is no necessary relationship between the amount of damages and the defendant's ability to pay for them. Such is not the case with punitive damages. As we explained in *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [202 Cal.Rptr. 204], "Because the purposes of punitive damages are to punish the defendant and to make an example of him, 'the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective' (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]), from which '[i]t also follows that the poorer the wrongdoing defendant the smaller the award of punitive damages need be in order to accomplish the statutory objective.' (*Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416].)"

In assessing whether the assets of the Association will necessarily be sufficient to satisfy any punitive damage award, the first issue we must confront is how is the wealth of an unincorporated association to be measured.[11] Just as the Kayes concede they do not seek an award of punitive

---

[11] We recognize "[n]et worth generally is considered the best measure of a defendant's 'wealth' for the purposes of assessing punitive damages." (*Devlin, supra,* 155 Cal.App.3d at p. 391.) We do not consider whether the net worth of an unincorporated association might be deemed to include its ability to assess its members for certain types of costs.

damages directly against individual members of the Association, we conclude it would unfairly accomplish the same result if the wealth of the Association were to be measured by the net worth of the individual members.

■ The purpose of punitive damages is to punish a culpable person or entity for outrageous conduct and thereby deter such conduct. (Rest.2d Torts, § 908; 6 Witkin, Summary of Cal. Law (9th ed. 1988) § 1327, pp. 784-785.) ■ The Restatement Second of Torts, section 909 allows for vicarious liability of employers for punitive damages arising out of torts committed by managing agents on the assumption that "the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions." (Rest.2d Torts, § 909, com. b; *Mitchell* v. *Keith* (9th Cir. 1985) 752 F.2d 385, 390.) Whatever validity that theory may have as to an unincorporated association, it clearly does not extend to the association's individual members who do not control the selection of managing agents except to the extent of their individual votes for members of the board of directors. (See *White* v. *Cox, supra,* 17 Cal.App.3d at p. 830.) Thus, the wealth of individual association members is simply not a relevant consideration where the deterrence rationale underlying the rule does not support direct punishment of such members.

What limited authority there is on this proposition is consistent with our conclusion. In *Smith* v. *Courter* (Mo.App. 1979) 575 S.W.2d 199, the plaintiff sued a partnership for compensatory and punitive damages based on the acts of an employee of the partnership. Although each partner was named as a defendant, the trial court in instructing the jury as to punitive damages referred to the defendant as the partnership.[12] The jury returned a single punitive damage award against the partnership and judgment was then entered against each partner in that amount. (*Id.* at pp. 208-209.) *Smith* noted that evidence of the wealth of individual members of a partnership is admissible only where individual awards of punitive damages are appropriate. In that case, however, there was no basis for any individual award because each partner's liability was vicarious and identical. (*Id.* at pp. 209-210.) Thus, any error in incorrectly referring to the defendant as the partnership was harmless. (See also *Blue* v. *Rose* (8th Cir. 1986) 786 F.2d 349, 352-353.) Similarly here, where each Association member's liability is

---

[12] Apparently under Missouri law, a partnership is a nonexistent entity and cannot be sued. (*Id.* at p. 208.) In contrast, under California law, a partnership or other unincorporated association "may sue and be sued in the name which it has assumed or by which it is known." (Code Civ. Proc., § 388, subd. (a); see generally *Barr* v. *United Methodist Church* (1979) 90 Cal.App.3d 259, 264-265 [153 Cal.Rptr. 322].)

vicarious if any, there is no basis for considering individual assets when assessing the Association's net worth.

If the wealth of an unincorporated association is to be measured independently of the assets of its individual members, the Kayes do not suggest any way in which an award of punitive damages against such an association can exceed the association's ability to pay the award. As the Supreme Court commented in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980], "[T]he function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." "Accordingly," as one court has indicated, "the punitive damages assessed should bear a reasonable relationship to the net assets of the defendant." (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469 [136 Cal.Rptr. 653], fn. omitted.) Although factors other than wealth may be relevant in determining how much the defendant should be punished, there can be no circumstances in which the necessity for punishment compels an award in excess of the defendant's ability to pay. Consistent with this principle, numerous cases have found awards of punitive damages excessive which constituted a significant percentage of the defendant's net worth. (See, e.g., *Seeley* v. *Seymour* (1987) 190 Cal.App.3d 844, 868 [237 Cal.Rptr. 282 (reversing as excessive an award representing 200 percent of the defendant's net worth); *Goshgarian* v. *George* (1984) 161 Cal.App.3d 1214, 1228 [208 Cal.Rptr. 321] ("awards *exceeding* 10 percent of a defendant's net worth have generally been disfavored by the appellate courts"); *Burnett* v. *National Enquirer* (1983) 144 Cal.App.3d 991, 1012 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125] (reducing a 35 percent-of-net-worth award); *Little* v. *Stuyvesant Life Ins. Co., supra,* 67 Cal.App.3d at pp. 469-470 (reversing an award which constituted in excess of 15 percent of the defendant's net worth); *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 18 (punitive damages of nearly one-third of defendant's net worth "excessive as a matter of law"); see also *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 824 (award representing more than seven months of defendant's annual net income deemed excessive).) From these principles it necessarily follows that an award of punitive damages against the Association cannot exceed the Association's ability to pay and hence, there is no practical need to join any individual members of the Association as defendants.

Although we have touched on a variety of legal issues, it bears emphasis that the focus of this opinion is on the propriety of the trial court's

denial of the class certification motion.[13] Class certification is a procedural device designed to save time and minimize costs. California courts have liberally interpreted the procedural prerequisites for class certification creating and fostering an environment conducive to the extensive use of class actions in a variety of contexts to simplify complex litigation. (E.g., *Vasquez v. Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Richmond v. Dart Industries, Inc., supra,* 29 Cal.3d 462; *Cartt v. Superior Court* (1975) 50 Cal.App.3d 960 [124 Cal.Rptr. 376]; *Hogya v. Superior Court* (1977) 75 Cal.App.3d 122 [142 Cal.Rptr. 325]; *Lazar v. Hertz Corp., supra,* 143 Cal.App.3d 128.) Occasionally, however, the benefits of a class action simply do not exceed its costs. (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 389 [134 Cal.Rptr. 393, 556 P.2d 755] (conc. opn. of Tobriner, J.).) Because we can conceive of no circumstances in which the Kayes will need to resort to the assets of individual Association members to satisfy any potential judgment on the theories they have alleged, we believe this is one of those unusual occasions. Accordingly, the trial court did not err in denying the Kayes' motion for certification of a defendant class.

## DISPOSITION

The judgment of dismissal is reversed. The order denying certification of a defendant class is affirmed. The parties shall bear their own costs for this appeal.

Work, J. and Brown (Gerald), J.,* concurred.

On November 4, 1988, the opinion was modified to read as printed above.

---

[13] Because it is unnecessary to our holding, we express no opinion on the fundamental question whether individual members of an unincorporated association may be held vicariously liable for punitive damages assessed against the association. As previously noted, the Kayes maintain that Code of Civil Procedure section 388, subdivision (b) requires that they be allowed to join all members of the Mount La Jolla Homeowners Association as defendants. (See *ante,* p. 1490.) No such attempt has been made and the propriety of such a tactic is not currently before us.

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.